SUMPTER v. SANDIFER.—72 S. W. (2d) 782.

Eastern Section. December 16, 1933.

Petition for Certiorari denied by Supreme Court, May 19, 1934.

Ernest F. Smith, of Morristown, for appellant.
William I. Davis, of Tazewell, for appellee.

PORTRUM, J.  The complainant, Clementine Sumpter (appellee here), is an illiterate woman 80 years of age, and the wife of a federal soldier and pensioner, who is 90 years of age and blind; they live upon a small tract of land of five acres in Claiborne county, and for years had hoarded a part of the pension money received by the husband and some gold belonging to the wife, which had been accumulated throughout the years, and a part of which had been in her possession for many years.  The currency amounted to about $2,000, and the gold to about $140; this money had been secreted about the home, and this fact was noised about in the neighborhood, where it was thought the old couple had accumulated much more money than actually existed.  Due to the age of this couple and the infirmity of the husband, five or six years ago a grandniece of the husband, who was then 25 years of age, was brought into the home and made a member of the family, and she is very attentive to her uncle.  There had been no children born to this marriage, and the old couple was alone.

As stated, it had been rumored that this old man and his wife were hoarding their money, and the amount had been greatly exaggerated, so one night robbers broke into the home through the window and attacked the old lady, striking her over the head and severely injured her, knocking her down, and extracting more than $200 from her bosom; the husband, who was in the bed, sprang up, although he was practically blind and could only discern the forms of the robbers, and attacked one of them; as he says, ''kicking at him with both feet,'' when he was struck over the head and from the blows his scalp was lacerated, causing gallons of blood to flow, as he ex-

pressed it. The grandniece came to his assistance and prevented a further attack upon him. The robbers were unable to find more of the money than they had taken from the wife's person.

As a result of this robbery, the old soldier and his wife became greatly agitated and were afraid; they decided it was unsafe to keep the money in the house or about the premises, and that their personal safety was in danger because there was no man of vigor within the house.

The defendant, Floyd D. Sandifer, had boarded in this home and taught school about the years 1916 and 1917, and this old couple was very fond of him; he had taken an interest in school athletics, and he was himself an athlete, having trained as an amateur prize, fighter. He was a man of intelligence, and in every way had gained the confidence of this couple. The defendant had property, but he was unmarried, and he could, without disadvantage to himself, come and live in this home and serve as a protection to the home. Mr. Sumpter sent for him and induced him to live in the home, and he was to live there without charge. Mrs. Sumpter was even more fond of the defendant than her husband, for the reason that Mr. Sumpter's affections were given to his grandniece, and two women in a home have a tendency to create discord.

Mrs. Sumpter had not always entertained a dislike for this niece, for she and her husband had joined in a deed of the property in which they lived to her, reserving only a life estate to themselves. The record shows the niece to be a beautiful and attractive young mountain girl, and she is smart and not illiterate. These qualities and the affectionate care of her uncle entitled her to his affectionate regard.

After Mr. and Mrs. Sumpter had induced the defendant, Sandifer, to come and live in their home, Mr. Sumpter intrusted him with $2,000 to take to Middlesboro, Kentucky, and deposit in a bank; he carried out the instructions, but this did not quiet the old couple, for banks were failing and they were very uneasy for fear the bank would fail. Mr. Sumpter decided to relieve himself of the care of this money, so he gave half of it to his niece and the other to his wife. Mrs. Sumpter then directed the defendant to deposit her half in a postal savings account in Middlesboro, which he did. But she was still uneasy, for she had been in possession of this money so long she was fearful she had lost control of the money; and she made inquiry of the defendant that in case she died what would become of the money. He told her that her nearest of kin would inherit the money. This displeased her, for she and her husband had suspicioned her relatives of making the attack upon them. The defendant states that he suggested that she make a will, but she expressed herself as disapproving wills.

She wanted to go back to her old method of hoarding the money,

and the defendant agreed that he would bury the money for her. Without any further advice or protest from him, he withdrew the funds from the postal savings bank and returned them to the home, that is, the wife's funds, and she turned over to him $1,000 in currency, and about $140 in gold to be placed in a fruit jar and buried. He took this money to his garage which he had constructed upon the place, and dug a hole in the runway at a place so as to be under the front wheel of his car and there buried the jar. The husband protested vigorously about bringing the money to the home, and told his wife that she must get it away from there. The defendant seems to have taken no interest in Mr. Sumpter's apprehension, for he made no suggestion about a different disposition of the funds. After a while the wife became uneasy for fear the currency would sweat, and she went with the defendant to the garage and he unearthed the money and found it in good condition. It was then returned to its burial place. And here is the point where the controversy arose; up until this time it is agreed that he was hiding the money for Mrs. Sumpter, but he says that, after Mrs. Sumpter had inspected the money, she gave it to him. He stated that he then thanked her as it was the most valuable gift he had ever received.

However, he admits that he put the money in the jar and put the jar back in the hole. Mrs. Sumpter denies that she gave him the money.

At a later time Mrs. Sumpter claimed that she needed the money to pay the doctor's bill and called upon the defendant for the money to meet her necessary expenses, and that the defendant put her off from time to time, replying "Well." But finally she followed him to the garage and demanded that he unearth the money and give her some, and he stated that she had given him the money and the money was no longer there, and, when asked where it was, he stated he had deposited the money in a bank in Johnson City, Tennessee. He admits this conversation, and that, when he told her he deposited the money in a bank in Johnson City, this was not true, for he then had it upon his person or had deposited it in a bank in Middlesboro, Kentucky—he could not remember which. He explained this demand of Mrs. Sumpter for the return of the money upon the theory that Mrs. Sumpter had fallen out with her niece, and was mad because her husband had given the niece half of the money, when they had made a joint will giving the survivor all of the property, and in this controversy the defendant had sided with the niece, which infuriated the old lady, and that the old lady thought the niece and he were sweethearts, which the record seems to bear out. He claims that Mrs. Sumpter is an Indian giver and is attempting to reclaim a valid gift.

In corroboration of his testimony he introduced several of the neighbors who had conversed with Mrs. Sumpter and had quizzed

her extensively as to her asserted poverty, calling her attention to the fact that she had money, when she denied it, asserting that she had given her money to the defendant. Mrs. Sumpter admits these conversations, but says she gave it to the defendant to bury for her. and she never gave it to him as a gift. In view of the fact that the husband was very much opposed to his wife having the money about the premises and the inquisitiveness of the neighbors, who thought, doubtless, that she had the money hid about the place. it was not unreasonable for her to make the statement, while at the same time she had made no absolute gift to the defendant of the funds. And, if this be true, the defendant does not stand upon very high ground in asserting the gift upon the statements of these witnesses.

The defendant introduced the husband, Mr. Sumpter, and the niece, as witnesses, to establish the gift. Mr. Sumpter states that his wife told him that she had given the money to the defendant. but he was the one who objected so strenuously to her keeping the money upon the premises. His first statement is not very strong in distinguishing the gift as one of bailment or an absolute gift, but upon repeated questions he strengthens his statement to conform to the identical words of the defendant and the niece. The use of the same language is a little remarkable for the reason that the conversations testified to by these witnesses were not the same conversation, but conversations which occurred at different times

And it must be remembered that the marital relationship between this old man and old woman had been disrupted, due to the fact that the niece had to a large extent superseded the old lady as the head of the house. It is not unnatural for this to occur when the younger generation is not dependent upon the older for special favors.

The appellee insists that, since it is established that the defendant received this fund as a bailment, the burden is upon him to show the subsequent absolute gift of the funds, and that he has failed to carry the burden, and that the declaration of gift by the alleged donor to third parties is insufficient to establish the gift; and that this principle is clearly established by the case of Atchley v. Rimmer, 148 Tenn., 322, 255 S. W., 366, 30 A. L. R., 1481, and that the case holds in addition to these declarations the donee must establish a delivery. The appellant insists that he has established the delivery, since it is agreed that the property was delivered to him in the first instance as a bailee, and, ''Where property is at the time of the gift in the possession of the donee, as agent for the donor or otherwise, it is not necessary that the donee shall surrender to the donor his actual possession in order that the latter may redeliver it to him in execution of the gift, but a relinquishment by the donor of all dominion over the property, in recognition of the possession of the donee as being in his own right, is sufficient to perfect the gift.'' 28 C. J., 638; 12 R. C. L., p. 936.

We are reminded repeatedly that we can only affirm the chancellor by branding the husband, the niece, the defendant, and all his other witnesses as perjurers. It is our duty to presume that all the witnesses attempt to swear the truth, and to reconcile the testimony as far as possible; but we can give full credit to the testimony of the defendant's witnesses and still conclude that the chancellor should be affirmed.

There is no question but what the defendant stood in a fiduciary relationship to the complainant, and he was mature, vigorous, and well informed, and he did not neglect to seek legal counsel prior to the institution of this suit. In his testimony he asserts that he stood in the place of a child, and was treated as a child in the affection of this old lady; and she was old, infirm, and illiterate. She trusted him with her money to bury it. He advised the niece, his sweetheart (and he had led the old gentleman to think he intended to marry the niece), to leave her money in the postal savings account, while he had acquiesced in the old lady's removal of hers to be buried by him. At the suggestion of the old lady, he removed the jar for inspection, and, after it had been given him, he reburied it, but he does not make a habit of burying his money, and he surreptitiously removed it and deposited it in his name.

The complainant was not free to act, for she was coerced by circumstances; she was confronted by the threats of robbery, by the failure of the bank, and her inability to dispose of the property at her death as she desired, and, to escape these dangers, as she thought, she intrusted her funds to the defendant. He was capable and willing to advise the niece to follow a safe course, but withheld his advice from this old lady who had put her explicit confidence in him, and he accepted without protest this improvident gift, and immediately sided with the sweetheart in the domestic difficulty without an attempt to reconcile the disputants. This gift we say was improvident, for it left this woman without any funds; and suspicious, for she had been hoarding her gold for many years and she evinced a tenacious possessory propensity. Under these circumstances, the insistence of the appellant shocked the conscience of the court and is an abuse of the fiduciary relationship existing between the parties. Mr. Gibson defines as a breach of the fiduciary relationship: "Contracts in a case where influence is acquired and abused, or where confidence is reposed and betrayed." And he says that fraud will be presumed when any person occupies a position of special trust and confidence towards the party from whom he obtains the gift or a contract unduly advantageous. Gibson's Suits in Chancery, sec. 936.

We are of the opinion that the decree of the chancellor should be affirmed, and a judgment will be entered here against the appellant and his bondsmen for the judgment below with interest and the costs

'of the cause, and the case will be remanded to the lower court for the sale of the attached property if this judgment is not satisfied within the time heretofore allowed by the chancery.

Snodgrass and Thompson, JJ., concur.